1
2
3
4
5
6
7
8             UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,            No.  1:14-cr-00193-NONE

12              Plaintiff,

13        v.                              ORDER DENYING DEFENDANT'S
                                          MOTION FOR COMPASSIONATE
14   RALPH DALE SHEPHERD,                 RELEASE

15              Defendant.                (Doc. No. 60)

16

17

18        Pending before the court is defendant Ralph Dale Shepherd's motion for compassionate

19   release pursuant to 18 U.S.C. § 3582(c)(1)(A).  The motion is largely based on defendant's

20   medical condition and the risks allegedly posed to him by the ongoing coronavirus ("COVID-

21   19") pandemic.  (Doc. No. 60.)  For the reasons explained below, defendant's motion will be

22   denied.

23                              **BACKGROUND**

24        On September 4, 2014, defendant Ralph Shepherd was indicted in this case for receipt or

25   distribution of material involving the sexual exploitation of minors in violation of 18 U.S.C. §

26   2252(a)(2) (Count One) and possession of material involving the sexual exploitation of minors in

27   violation of 18 U.S.C. § 2252(a)(4)(B) (Count Two).  (Doc. No. 1.)  On February 10, 2016,

28   pursuant to the parties' plea agreement, defendant Shepherd entered a plea of guilty to Count Two

                                          1

1  of the indictment  (Doc. Nos. 45 at 2; 46.)  The presentence report prepared in defendant's case

2  summarized his offense conduct, reporting that law enforcement learned in December 2013 that

3  someone was uploading child pornography to a particular Google account.  (Doc. No. 51

4  (Presentence Report) at 4.)  At that time, defendant was already on parole for a 2010 sex offense

5  conviction involving the molestation of a minor.  (*Id.*)  After law enforcement identified that the

6  IP address used to upload the child pornography was owned by defendant's deceased wife, agents

7  conducted a parole search of defendant's residence, which revealed that his cell phone contained

8  over 300 files of child pornography and erotica.  (*Id.* at 5.)  Following his guilty plea, it was

9  determined that under the U.S. Sentencing Guidelines defendant Shepherd's adjusted offense

10 level was 32 and his criminal history placed him in category III, resulting in an advisory

11 sentencing guideline range calling for a term of imprisonment of between 151 and 188 months.

12 (*Id.* at 15.)  The U.S. Probation Office recommended a sentence of 151 months.  (*Id.*)  On May

13 16, 2016, the court sentenced defendant to 151 months in prison, a 180-month term of supervised

14 release to follow, and to pay the mandatory special assessment of $100.  (Doc. Nos. 54; 55 at 2–

15 6.)

16     Defendant is currently serving his sentence at the U.S. Bureau of Prisons' ("BOP") Forrest

17 City Federal Correctional Institution (Low) in Forrest City, Arkansas ("FCI Forrest City").  *Find*

18 *an inmate*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Dec. 21,

19 2020.)  Defendant's projected release date is June 2, 2025.  *Id.*  On October 23, 2020, defendant

20 filed the pending motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).  (Doc.

21 No. 60.)  On November 20, 2020, the government filed its opposition to the motion, and on

22 November 30, 2020, defendant filed his reply thereto.  (Doc. Nos. 66, 72.)

23                                **LEGAL STANDARD**

24     A court generally "may not modify a term of imprisonment once it has been imposed."  18

25 U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of

26 conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not

27 be modified by a district court except in limited circumstances.").  Those limited circumstances

28 include compassionate release in extraordinary cases.  *See United States v. Holden*, 452 F. Supp.

1   3d 964, 968 (D. Or. 2020).  Prior to the enactment of the First Step Act of 2018 ("the FSA"),

2   motions for compassionate release could only be filed by the BOP.  18 U.S.C. § 3582(c)(1)(A)

3   (2002).  Under the FSA, however, imprisoned defendants may now bring their own motions for

4   compassionate release in the district court.  18 U.S.C. § 3582(c)(1)(A) (2018).  In this regard, the

5   FSA specifically provides that a court may

6       upon motion of the defendant after the defendant has fully exhausted
        all administrative rights to appeal a failure of the [BOP] to bring a
7       motion on the defendant's behalf[1] or the lapse of 30 days from the
        receipt of such a request by the warden of the defendant's facility,
8       whichever is earlier, may reduce the term of imprisonment (and may
        impose a term of probation or supervised release with or without
9       conditions that does not exceed the unserved portion of the original
        term of imprisonment), after considering the factors set forth in [18
10      U.S.C. §] 3553(a) to the extent that they are applicable, if it finds
        that –
11
12      (i)    extraordinary  and  compelling  reasons  warrant  such  a
               reduction; or
13
        (ii)   the defendant is at least 70 years of age, has served at least 30
14             years in prison, pursuant to a sentence imposed under section
               3559(c), for the offense or offenses for which the defendant
15             is currently imprisoned, and a determination has been made
               by the Director of the [BOP] that the defendant is not a danger
16             to the safety of any other person or the community, as
               provided under section 3142(g);
17
        and that such a reduction is consistent with applicable policy
18      statements issued by the Sentencing Commission [.]

19  /////

20  /////

21  /////

22  /////

23

24  [1] If the BOP denies a defendant's request within 30 days of receipt of such a request, the
    defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the
25  date the Warden signed the response."  28 C.F.R. § 542.15(a).  If the Regional Director denies a
    defendant's administrative appeal, the defendant must appeal again to the BOP's "General
26  Counsel within 30 calendar days of the date the Regional Director signed."  *Id.*  "Appeal to the
    General Counsel is the final administrative appeal."  *Id.*  When the final administrative appeal is
27  resolved, a defendant has "fully exhausted all administrative rights."  *See* 18 U.S.C.
    § 3582(c)(1)(A).
28

1    18 U.S.C. § 3582(c)(1)(A)(i) and (ii).[2]

2        The applicable policy statement with respect to compassionate release in the U.S.

3    Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and

4    compelling reasons."  U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13[3]; *see also*

5    *United States v. Gonzalez*, 451 F. Supp. 3d 1194, 1197 (E.D. Wash. 2020) (noting that courts

6    "universally" rely on U.S.S.G. § 1B1.13 to define "extraordinary and compelling reasons," even

7    though that policy statement was issued before Congress passed the FSA and authorized

8    defendants to file compassionate release motions).  However, a large and growing number of

9    district courts across the country have concluded that because the Sentencing Commission has not

10   amended the Guidelines since the enactment of the FSA, courts are not limited by the pre-FSA

11   categories described in U.S.S.G. § 1B1.13 in assessing whether extraordinary and compelling

12

13   [2]  Under 18 U.S.C. § 3624(c)(2), the BOP may release an incarcerated defendant to home
confinement "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6
14   months."  The Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act"), Pub. L.
116-136, expands the BOP's authority to release incarcerated defendants without judicial
15   intervention.  The CARES Act allows the BOP to "lengthen the maximum amount of time" for
which a prisoner may be placed in home confinement under § 3624(c)(2) "as the Director
16   determines appropriate," assuming "the Attorney General finds that emergency conditions will
materially affect the functioning" of the BOP.  CARES Act, Pub. L. 116-136, Div. B, Title II,
17   § 12003(b)(2) (2020).  However, the BOP's authority in this regard is limited to "the covered
emergency period."  *Id.*  The BOP's authority expires "30 days after the date on which the
18   national emergency declaration terminates."  *Id.* § 12003(a)(2).  After the CARES Act was
enacted, the Attorney General issued a memo instructing the BOP to "immediately review all
19   inmates who have COVID-19 risk factors" beginning with those who are housed at facilities
where "COVID-19 is materially affecting operations."  Office of Att'y Gen., *Increasing Use of
20   Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020).  The BOP has
acted on the Attorney General's guidance, including one case in which a sentenced prisoner was
21   released to home confinement after serving less than half his sentence from a facility that reported
no positive COVID-19 cases at the time of his release.  *See* Hannah Albarazi, *Paul Manafort
22   Seeks Prison Release Over COVID-19 Fears*, Law360 (Apr. 14, 2020), https://www.law360.
com/articles/1263706/paul-manafort-seeks-prison-release-over-covid-19-fears (noting that the
23   prisoner's counsel had argued that the CARES Act "broadens the authority" of the BOP to release
prisoners to home confinement); Khorri Atkinson, *Paul Manafort Released From Prison Amid
24   COVID-19 Fears*, Law360 (May 13, 2020), https://www.law360.com/articles/1273090/paul-
manafort-released-from-prison-amid-covid-19-fears.
25

26

27   [3]  The Sentencing Guidelines also require that to be granted a reduction of sentence under 18
U.S.C. § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person
28   or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).

1    circumstances are presented justifying a reduction of sentence under 18 U.S.C. § 3582(c).  *See,*

2    *e.g.*, *United States v. Parker*, 461 F. Supp. 3d 966, 978–79 (C.D. Cal. 2020) (collecting cases);

3    *United States v. Rodriguez*, 424 F. Supp. 3d 674, 681 (N.D. Cal. 2019).

4           In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the

5    defendant bore the initial burden of demonstrating that a sentence reduction was warranted.  *See*

6    *United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998).  Although the Ninth Circuit

7    has not specifically addressed the question of which party bears the burden in the context of a

8    motion for compassionate brought pursuant to § 3582(c) as amended by the FSA, district courts

9    that have done so have agreed that the burden remains with the defendant.  *See, e.g.*, *United*

10   *States v. Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020);

11   *United States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, at *3 (W.D. Wash. May 7,

12   2020).

13                                            **ANALYSIS**

14          As district courts have summarized, in analyzing whether a defendant is entitled to

15   compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the court must determine whether a

16   defendant has satisfied three requirements:

17                  First, as a threshold matter, the statute requires defendants to exhaust
                    administrative remedies.  18 U.S.C. § 3582(c)(1)(A).  Second, a
18                  district court may grant compassionate release only if "extraordinary
                    and compelling reasons warrant such a reduction" and "that such
19                  reduction is consistent with applicable policy statements issued by
                    the Sentencing Commission.  *Id.*  Third, the district court must also
20                  consider "the factors set forth in Section 3553(a) to the extent that
                    they are applicable."  *Id.*
21

22   *Rodriguez*, 424 F. Supp. 3d at 680; *see also United States v. Ramirez-Suarez*, 16-CR-00124-

23   LHK-4, 2020 WL 3869181, at *2 (N.D. Cal. July 9, 2020); *Parker*, 461 F. Supp. 3d at 973–74;

24   *United States v. Trent*, No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9,

25   2020) (noting that as to the third factor, under 18 U.S.C. § 3582(c)(1)(A) release must be

26   "consistent with" the sentencing factors set forth in §3553(a)).

27   /////

28   /////

1    **A.      Administrative Exhaustion**

2              On August 5, 2020, defendant Shepherd submitted an administrative request to the

3    Warden at FCI Forrest City seeking compassionate release due to his medical condition, although

4    he has not submitted a copy of that request as an exhibit to the pending motion.  (Doc. No. 60-1

5    (Declaration of Assistant Federal Defender Jaya Gupta) ¶ 7.)  Defendant represents that as of the

6    date he filed the pending motion with this court he had not received a response from the Warden.

7    (Doc. No. 60 at 13.)  The government concedes that defendant exhausted his administrative

8    remedies.  (Doc. No. 66 at 3–4.)  The court concludes that defendant exhausted his administrative

9    remedies because he filed the pending motion for compassionate release after submitting a

10   request to the Warden at his prison of confinement and waiting more than 30 days without

11   receiving a response to his administrative request.  Therefore, the court will turn to the merits of

12   defendant's motion.

13   **B.      Extraordinary and Compelling Reasons**

14             "Extraordinary and compelling reasons" warranting compassionate release may exist

15   based on a defendant's medical conditions, age and other related factors, family circumstances, or

16   "other reasons."  U.S.S.G. § 1B1.13, cmt. n.1 (A)–(D).  Even though the catch-all of "other

17   reasons" was included in the policy statement at a time when only BOP could bring a

18   compassionate release motion, courts have agreed that it may be relied upon by defendants

19   bringing their own motions under the FSA.  *See, e.g.*, *United States v. Kesoyan*, No. 2:15-cr-236-

20   JAM, 2020 WL 2039028, at *3–4 (E.D. Cal. Apr. 28, 2020) (collecting cases).

21             Thus, the medical condition of a defendant may warrant compassionate release where he

22   or she "is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life

23   trajectory)," though "[a] specific prognosis of life expectancy (i.e., a probability of death within a

24   specific time period) is not required."  U.S.S.G. § 1B1.13, cmt. n.1 (A)(i).  Non-exhaustive

25   examples of terminal illnesses that may warrant a compassionate release "include metastatic

26   solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced

27   dementia."  *Id.*  In addition to terminal illnesses, a defendant's debilitating physical or mental

28   condition may warrant compassionate release, including when:

1

The defendant is

2

(I)   suffering from a serious physical or medical condition,

3

(II)  suffering from a serious functional or cognitive impairment, or

4

(III) experiencing deteriorating physical or mental health because of
the aging process,

5

6

that substantially diminishes the ability of the defendant to provide
self-care within the environment of a correctional facility and from
which he or she is not expected to recover.

7

8

*Id.* at cmt. n.1 (A)(ii).  Where a defendant has moderate medical issues that otherwise might not

9

be sufficient to warrant compassionate release under ordinary circumstances, some courts have

10

concluded that the risks posed by the COVID-19 tips the scale in favor of release in particular

11

situations.  *See, e.g.*, *United States v. Rodriguez*, 451 F. Supp. 3d 392, 405–06 (E.D. Pa. 2020)

12

("Without the COVID-19 pandemic—an undeniably extraordinary event—Mr. Rodriguez's

13

health problems, proximity to his release date, and rehabilitation would not present extraordinary

14

and compelling reasons to reduce his sentence.  But taken together, they warrant reducing his

15

sentence.").

16

Compassionate release may also be warranted based on a defendant's age and other

17

related factors.  In these situations, "extraordinary and compelling reasons" exist where a

18

"defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or

19

mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of

20

his or her term of imprisonment, whichever is less."  U.S.S.G. § 1B1.13, cmt. n.1(B).[4]  In

21

determining a defendant's projected release date, courts may consider any "good time credits"

22

awarded to the defendant by BOP for "exemplary" behavior in prison as set forth in 18 U.S.C. §

23

3624(b)(1).  *See, e.g.*, *United States v. Burrill*, 445 F. Supp. 3d 22, 24 n.1 (N.D. Cal. Apr. 10,

24

2020).

25

Here, defendant Shepherd argues that extraordinary and compelling reasons warranting

26

his compassionate release exist due to his medical conditions.  To qualify for compassionate

27

28

[4]  Because defendant Shepherd is only 63 years old, (*see* Doc. No. 51 (Presentence Report) at 2),
these age and age-related factors are irrelevant to the court's disposition of the pending motion.

7

1  release, defendant must demonstrate that he is suffering from some "serious" medical condition

2  "that substantially diminishes [his] ability . . . to provide self-care" in FCI Forrest City and the

3  medical condition is one "from which he . . . is not expected to recover." *See* U.S.S.G. § 1B1.13,

4  cmt. n.1 (A)(ii).  Specifically, defendant argues that his obesity, high blood pressure, and other

5  health ailments put him at greater risk for becoming severely ill if he contracts COVID-19.  (Doc.

6  No. 60 at 11–12, 15–22.)  At the time of his sentencing in this case, it was noted that defendant

7  suffered from high blood pressure and was taking prescription medication.  (Doc. No. 51

8  (Presentence Report) at 10.)  It was also reported that defendant had undergone gastric bypass

9  surgery in 2000 and had recovered from that surgery.  (*Id.*)  Other than those two conditions and a

10  minor hospitalization as a child, defendant reported "positive physical health" at that time.  (*Id.*)

11  According to defendant's BOP medical records, generated in September of this year, defendant

12  currently suffers from essential hypertension, in addition an "unspecified" digestive system

13  disease and other conditions relating to his skin.  (Doc. No. 64 at 31 (sealed).)  Defendant is

14  taking several prescription medications for his hypertension.  (*Id.* at 38–39.)  In addition,

15  defendant's height is 5'8" and, as of July 2019, he weighs 230 pounds.  (Doc. Nos. 51

16  (Presentence Report) at 2; 64 at 4 (sealed).)  Thus, according to the BOP, defendant's body mass

17  index (BMI) is 33.  (Doc. No. 64 at 5 (sealed).)

18        According to the U.S. Centers for Disease Control and Prevention ("CDC"), defendant is

19  at higher risk of suffering a severe illness if he contracts COVID-19 due to his obesity.  *See*

20  *Coronavirus Disease 2019 (COVID-19): People Who Are at Increased Risk for Severe Illness*,

21  CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-

22  ncov/need-extra-precautions/people-at-increased-risk.html (last visited Dec. 21, 2020).  Further,

23  because of defendant's (essential) hypertension and high blood pressure conditions, he "might be

24  at an increased risk for severe illness" from COVID-19.  *Id.* (distinguishing from pulmonary

25  hypertension).  Although defendant suffers from other medical conditions, none of those ailments

26  place him at greater risk of contracting a severe illness from COVID-19, according to the CDC.

27  Still, defendant suffers from two comorbidities.  As the CDC recognizes, "[t]he more underlying

28  medical conditions someone has, the greater their risk is for severe illness from COVID-19."  *Id.*

8

1    Finally, defendant is 63 years old, which places him at some greater risk of severe illness from the

2    virus compared to younger individuals.  *Id.* (stating those between 50 and 64 years old are three

3    times more likely to require hospitalization and 30 times more likely to die as compared to 18-

4    and-29-year-old individuals).

5            However, the risk posed to defendant from COVID-19 must be assessed in light of the

6    current circumstances established by the evidence before the court.  At this point, defendant's

7    actual risk of contracting a severe illness due to COVID-19 is speculative.  On May 7, 2020,

8    defendant tested positive for COVID-19.  (Doc. No. 65 at 20, 29 (sealed).)  On the day he tested

9    positive, defendant denied suffering from any of the major symptoms of COVID-19, including a

10   cough, shortness of breath, muscle pain, fatigue, sore throat, a headache, new loss of taste and

11   smell, and chills.  (*Id.* at 14.)  Moreover, defendant was screened for COVID-19 symptoms 19

12   times over the course of three weeks following his positive diagnosis.  (*Id.* at 13–14.)  Defendant

13   reported a normal body temperature each of those days and denied having any symptoms on

14   nearly all of those days; some days listed in his BOP medical record provide no details other than

15   that defendant was monitored on the particular day and his body temperature was normal.  (*Id.*)

16   In his pending motion, defendant now claims that he was not actually asymptomatic because he

17   "suffered from congestion, persistent cough, and severe headaches[.]"  (Doc. No. 60 at 18.)

18   However, that contention is not supported, and it is actually contradicted, by his BOP medical

19   records.  The evidence before the court is that defendant contracted COVID-19 nearly seven

20   months ago and was asymptomatic.

21           Defendant argues that the possibility of his reinfection with the virus weighs in favor of

22   his release.  (*Id.* at 18–21.)  In this regard, many courts have "err[ed] on the side of caution to

23   avoid potentially lethal consequences" because "the science is unclear on whether reinfection is

24   possible."  *United States v. Yellin*, No. 3:15-cr-3181-BTM-1, 2020 WL 3488738, at *13 (S.D.

25   Cal. June 26, 2020) (finding extraordinary and compelling reasons exist where a COVID-positive

26   inmate at FCI Terminal Island, who did not develop severe symptoms, suffered from a

27   combination of medical conditions that placed him at risk of serious complications from COVID);

28   *see also United States v. Hanson*, 470 F. Supp. 3d 1197, 1202 (D. Or. 2020) ("[T]here is no

9

1    current scientific evidence to indicate that a 'recovered' COVID-19 patient is immune from

2    reinfection, as several courts have recently acknowledged. . . . [T]he Court remains concerned

3    about FCI Terminal Island's ability to provide adequate care in light of defendant's complex

4    medical needs.  The Court is not convinced that FCI Terminal Island has been successfully

5    mitigating the risk of reinfection, given the high numbers of infected inmates and Defendant's

6    own contraction of the virus.").  Other courts have taken the position that uncertainty surrounding

7    the danger of reinfection "cuts against compassionate release," in part because it is the

8    defendant's burden to establish that "extraordinary and compelling reasons" justifying

9    compassionate release exist.  *See United States v. Molley*, No. CR15-0254-JCC, 2020 WL

10   3498482, at *3 (W.D. Wash. June 29, 2020).

11        Here, the court concludes out of an abundance of caution that because of his age, obesity,

12   and essential hypertension—combined with the risk of reinfection from COVID-19—defendant

13   Shepherd has and is "suffering from a serious physical . . . condition . . . from which he . . . is not

14   expected to recover."  *See* U.S.S.G. § 1B1.13, cmt. n.1 (A)(ii).  However, to establish

15   extraordinary and compelling reasons justifying his compassionate release, defendant must still

16   demonstrate that his medical conditions "substantially diminish[] [his] ability . . . to provide self-

17   care" in FCI Forrest City.  *See id.*

18        Based on the record now before the court, defendant has failed to demonstrate that he is

19   significantly hindered in providing himself with care while in prison.  It is true that FCI Forrest

20   City suffered from a very significant COVID-19 outbreak, with 603 inmates and four staff who

21   tested positive but recovered, while zero inmates died at the hands of the virus.  *See COVID-19*,

22   FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited Dec. 24, 2020).[5]

23   At the moment, there are currently 99 inmates and 18 staff who are positive with COVID-19.[6]

24   While FCI Forrest City has made significant strides in reducing the total number of cases,

25
26   [5] FCI Forrest City has a population of only 1,660 inmates.  *FCI Forrest City Low*, FEDERAL
     BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/for/ (last visited Dec. 21, 2020).

27   [6]  While the undersigned does not necessarily accept these reported numbers at face value in light
28   of current CDC guidelines with respect to both testing and the manner of counting "active cases,"
     there is also no evidence before the court challenging those reported numbers in this case.

1   COVID-19 is still present inside the facility.  However, the court does not find this fact alone to

2   be dispositive as to whether defendant can properly care for himself while incarcerated at FCI

3   Forrest City.  Aside from citing the general possibility of contracting COVID-19 again—the risk

4   of which appears speculative for an individual who was asymptomatic the first time he contracted

5   the virus[7]—defendant has not established that he is presently "substantially" inhibited in

6   providing "self-care" in FCI Forrest City.  *See* U.S.S.G. § 1B1.13, cmt. n.1 (A)(ii).  For example,

7   on June 16, 2020, about six weeks after defendant tested positive for COVID-19, he had a

8   medical appointment for his chronic skin condition.  (Doc. No. 65 at 5 (sealed).)  During that

9   medical appointment, defendant did not complain about any COVID-19 related symptoms.  (*See*

10  *id.* (stating defendant reported "no other areas of concern").)  In fact, at that time, the BOP's

11  medical staff noted that defendant appeared "[w]ell, [a]lert, and [o]rientated."  (*Id.*)  Based on the

12  medical evidence currently before this court, defendant is conditioning well while in prison and

13  appears to be receiving proper care from the BOP's medical staff.  While there is still some

14  unknown risk to defendant due to the possibility that he could be reinfected with COVID-19, that

15  speculative possibility provides no basis upon which the court could conclude that defendant is

16  presently "substantially diminishe[d]" in his ability to "provide self-care" at FCI Forrest City.

17  *See* U.S.S.G. § 1B1.13, cmt. n.1 (A)(ii).  Thus, defendant Shepherd has failed to carry his burden

18  in this regard.  *See Greenhut*, 2020 WL 509385, at *1 ("The defendant bears the initial burden to

19  put forward evidence that establishes an entitlement to a sentence reduction.").

20          Accordingly, in this case, the court does not find extraordinary and compelling reasons

21  justifying compassionate release pursuant to § 3582(c)(1)(A).

22

23  [7]  Defendant cites various medical studies suggesting there is some possibility of his reinfection
    from COVID-19.  (Doc. No. 72 at 4.)  Those studies confirm that, at the moment, the possibility
24  of reinfection is speculative and far from certain.  *See, e.g.*, Kelvin Kai-Wang To, et al.,
    *Coronavirus Disease 2019 (COVID-19) Re-infection by a Phylogenetically Distinct Severe Acute*
25  *Respiratory Syndrome Coronavirus 2 Strain Confirmed by Whole Genome Sequencing*, OXFORD
    ACADEMIC: CLINICAL INFECTIOUS DISEASES (Aug. 25, 2020), https://doi.org/10.1093/cid/
26  ciaa1275 ("[I]t remains unclear whether true re-infection occurs."); Richard L. Tillett, et al.,
    *Genomic evidence for reinfection with SARS-CoV-2: a case study*, THE LANCET (Oct. 12, 2020),
27  https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(20)30764-7/fulltext (observing
    a single patient and concluding the finding "suggests" the patient was infected twice).
28

1    **C.**     **Consistency With the § 3553(a) Factors**

2           Finally, as noted above, any relief to be granted pursuant to 18 U.S.C. § 3582(c)(1)(A)

3    must be consistent with the sentencing factors set forth in §3553(a).[8]  *Trent*, 2020 WL 1812242,

4    at *2; *see also Parker*, 461 F. Supp. 3d at 981.  Here, consideration of the § 3553(a) sentencing

5    factors also do not support defendant Shepherd's release.

6           Defendant Shepherd's offense conduct in this case was very troubling.  Law enforcement

7    discovered over 300 images of child pornography and erotica on his cell phone.  (Doc. No. 51 at

8    4.)  As the presentence report in his case noted, "the bulk of the images featured sexually explicit

9    photos of minor females, ranging from infancy to approximately 6 years of age.  Some of the

10   images depicted material portraying sadistic or masochistic conduct or other depictions of

11   violence." (*Id.* at 5.)  Additionally, in 2009, defendant was convicted in state court for engaging

12   in lewd or lascivious acts with a child under the age of 14 for which he was sentenced to three

13   years in state prison.  (*Id.* at 8.)  In that prior case, the victim was the defendant's granddaughter,

14   who he had legal guardianship over at the time of the offense conduct.  (*Id.*)  Defendant's conduct

15   in that case, which the court will not summarize here, was also extremely troubling.  (*See id.* at 8–

16   9.)  In this case, defendant was subject to a 10-year mandatory minimum term of imprisonment.

17   (*Id.* at 15.)  Ultimately, defendant received a low-end guideline sentence of 151 months in prison.

18   (*Id.*; Doc. No. 54.)  As of the date of this order, defendant has served approximately 75 months in

19   prison, or approximately 60% of his sentence accounting for good time credits.  (Doc. No. 66-1 at

20   /////

21

---

22   [8]  Title 18 U.S.C. § 3553(a) provides that, in determining the sentence to be imposed, the court
     shall consider:  the nature and circumstances of the offense and the history and characteristics of
23   the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote
     respect for the law, provide just punishment for the offense, afford adequate deterrence, protect
24   the public from further crimes of the defendant and provide the defendant with needed
     educational or vocational training, medical care, or other correctional treatment in the most
25   effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range
     established for the applicable category of offense committed by the applicable category of
26   defendant as set forth in the guidelines; any pertinent policy statement issued by the Sentencing
     Commission; the need to avoid unwarranted sentence disparities among defendants with similar
27   records who have been found guilty of similar conduct; and the need to provide restitution to any
     victims of the offense.
28

12

4.)  In other words, defendant has not even served the mandatory minimum sentence required for his offense of conviction.

Based on the record in this case, a downward variance/reduction of defendant's sentence is not justified.  Although the court notes defendant's post-incarceration attempts at rehabilitation, (*see* Doc. No. 60-1 (Declaration of Assistant Federal Defender Jaya Gupta) ¶ 8), it is simply not enough to overcome the seriousness of his criminal conduct in this case.  In the undersigned's view, a 75-month sentence (essentially a 76-month reduction of the sentence imposed) would not reflect the seriousness of defendant's offense of conviction, promote respect for the law, provide just punishment, or afford adequate deterrence to criminal conduct.  *See* § 3553(a); *see also United States v. Purry*, No. 2:14-cr-00332-JAD-VCF, 2020 WL 2773477, at *2 (D. Nev. May 28, 2020); *United States v. Shayota*, No. 1:15-cr-00264-LHK-1, 2020 WL 2733993, at *5–6 (N.D. Cal. May 26, 2020) ("The length of the sentence remaining is an additional factor to consider in any compassionate release analysis, with a longer remaining sentence weighing against granting any such motion." (citation omitted)).[9]  Thus, the court concludes that granting defendant

---

[9]  Defendant suggests that the court amend the conditions of his supervised release to require him to serve the remaining custodial term on home confinement.  (Doc. No. 60 at 33.)  First, the CARES Act "'authorizes the BOP—not courts—to expand the use of home confinement' under 18 U.S.C. § 3624(c)(2)."  *United States v. Fantz*, No. 5:14-cr-32-BR, 2020 WL 3492028, at *1 (E.D.N.C. June 26, 2020) (quoting *United States v. Nash*, No. 19-cr-40022-01-DDC, 2020 WL 1974305, at *2 (D. Kan. Apr. 24, 2020) (collecting cases)); *see also United States v. Rice*, No. 12-cr-818-PJH, 2020 WL 3402274, at *4 (N.D. Cal. June 19, 2020) (denying a defendant's request for release to home confinement made in conjunction with his motion for compassionate release because "the court has no authority to designate the place of confinement" and the "Bureau of Prisons has the statutory authority to choose the locations where prisoners serve their sentence."); *United States v. Gray*, No. 4:12-cr-54-FL-1, 2020 WL 1943476, at *3 (E.D.N.C. Apr. 22, 2020) (holding that the CARES Act "does not authorize the court to order defendant's placement in home confinement").  The district court may only impose home detention as a condition of supervised release, rather than as part of a sentence of imprisonment.  *See United States v. Connell*, No. 18-cr-00281-RS, 2020 WL 2315858, at *5, n.6 & *7 (N.D. Cal. May 8, 2020).  Accordingly, to do as defendant requests, the court would be required to reduce his sentence to one of time served and modify the conditions of supervised release to require home confinement for the remainder of his sentence.  The court is unwilling to do so for the reasons set forth above.  The BOP knows its capabilities to effectively and appropriately care for defendant Shepherd in a custodial setting.  If the BOP determines that defendant should be released to home confinement to serve his sentence under the Attorney General's expanded authority in that regard, the court trusts it will do so.  The issue that this court resolves is merely whether in its view, under the applicable legal standards, defendant's sentence should be reduced at this time.

1  Shepherd's compassionate release would be inconsistent with consideration of the § 3553(a)

2  sentencing factors and his motion will be denied on this basis as well.

3  **CONCLUSION**

4          For the reasons explained above, the court concludes that defendant has not demonstrated

5  that "extraordinary and compelling reasons" exist warranting his compassionate release from

6  prison.  Moreover, the court finds that the granting of release at this time would not be consistent

7  with consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a).   Accordingly,

8  defendant's motion for compassionate release (Doc. No. 60) is denied.

9  IT IS SO ORDERED.

10     Dated:   **December 24, 2020**

11                                          UNITED STATES DISTRICT JUDGE

14